Good morning, Your Honors. This may be a bit ambitious, but I'm going to try to touch on three different issues this morning. First, the Batson issue. Second, the issue relating to the subjective intent instruction. And then lastly, whether the conduct proven at trial falls within the ambit of the forced labor statute. Starting with Batson, the government used its first peremptory strike on a black juror that was 24 years old, single, had no kids. The government used its second peremptory strike on a black juror that was 26 years old, single, and had no kids. The government then did not strike juror number 34, a white juror who was 33 years old, single, no kids. The government used its fifth peremptory strike on juror number 42, a black 29-year-old, single juror with no kids. Then the government did not strike the next juror, juror 38, a white juror who was 34 years old, single, and with no kids. Hasn't the government said that its goal in striking the panel was to strike any potential juror who was under 30, unmarried, and childless? That's exactly, Your Honor, what they say in their brief. However... Well, they're not... I know what you're going to say. At the trial, they didn't say that. They said that they struck people because they were very young. But my point is that that is what they've said, and my question is, did they leave anybody on the jury who was under 30, unmarried, and childless? No, they did not. In the briefing, they have gerrymandered a line between the people that they struck and the people they didn't. But at trial, when Judge Gibney observed that juror number 42 was young, single, and with no kids, but nonetheless the government struck them, the trial prosecutor did not take issue with the fact that 42 was young or suggest that there was a difference in how they viewed the age of juror 42 or juror 38. In fact, the only thing that the government said, other than they did not want young, single, and no children, not under 30, single, and no children, was that at this point they only had one remaining strike. But the government didn't address the fact that earlier, when juror 34 came up, when the government still had several strikes, it didn't strike juror number 34, a white juror, who was even younger than jury 38, and also single and with no kids. And the government offered no reason whatsoever why it would have believed that a 29-year-old single with no kids juror did not have sufficient life experience to sit as a juror in this case, but a 33-year-old juror who was single and no kids did. In fact, even in the post hoc justification in the briefing, the government does not offer an explanation for that. But, Your Honor, the post hoc justification is irrelevant. The court must rely on what the trial costs. Can I ask you another question? Okay. In your reply brief, you suggest that we should remand for further proceedings on Batson. What would that look like? Well, Your Honor, to be clear, I don't think that the court needs to do that. I think the court can determine from this record that the race-neutral reason was, in fact, protection and that there is no meaningful distinction between the jurors that were black, that were stricken, and the jurors. So you didn't suggest that in your reply brief that we remand? Is that just an alternative? That is in the alternative, Your Honor. The court never explicitly said that it was finding that there was a prima facie showing of discrimination, although it certainly acted as if there were. And the three out of the first five strikes, 60 percent were against black jurors when the panel was only 22 percent black. Similarly, Judge Gibney never explicitly said that he was crediting the government's explanation or why. He simply said that the government was playing with fire. So certainly the court could remand for further explication from Judge Gibney or for further showing from the government if Judge Gibney wanted to entertain any additional reasons from the government trial prosecutor, factual reasons, as to why the strikes were done as they were. But, again, I don't believe that the court needs to because the prosecution did offer reasons. The problem is that those reasons cannot be credited based on the record. They can be, the reasons they're giving after the trial can be credited based on the record, but not the reasons they gave during trial. No, the reasons that they've given after the trial are irrelevant. With respect to the reasons why a juror was struck, the government is stuck. No, I understand that you're talking about, you're saying that their reasons that they're giving now are post hoc and can't be credited for what was happening during the actual trial. And during the actual trial, they simply said they were striking young jurors and that didn't really square with what was happening. And I know you have two other issues you want to get to, but however you want to proceed. Thank you, Judge. Yes, you're precisely right. You're stuck with what the prosecutor said. And as this court said in Chamberlain v. Fisher, with respect to why a juror is stricken, you have to look solely to the reasons that were given by the trial prosecutors, not any post hoc rationalization for it. I will now, with the court's permission, proceed to the issue of the subjective intent instruction. The defense asked for an instruction with respect to the forced labor charge that included the following. In addition, the defendants must have made the statement intending it to be a threat or with knowledge that the statement would be viewed as a threat. And that subjective intent component of the jury instruction comes directly from the model instruction from the Sand Treatise. What Judge Gibney did, however, was he gave the standard instruction straight out of Sand but omitted the portion about requiring subjective intent. The government argues, and in doing so, that violated the subsequent decision in Counterman v. Colorado. The government argues that Counterman does not apply to this case for two reasons. First, because the forced labor statute criminalizes conduct, not speech. And second, because the forced labor statute has a mens rea requirement of knowing. And then lastly, the government argues that even if, in fact, Counterman does apply and there was error, that that error was harmless. Let me address each of those in turn. First, with respect to conduct, the district court permitted the government to argue that verbal threats compelled labor. So even if the First Amendment had no application to conduct, the answer that this statute involves conduct would be of no moment. But in fact, the court permitted the government to argue throughout that the conduct by the defendants, the conduct by the defendants constituted communication as an implied threat. And the First Amendment does apply to communicative acts. I call the court's attention to United States v. Dodson, D-O-D-S-O-N. This is a recent case that is not in the papers. It's a 2024 Westlaw 712494. That case applied Counterman to the obstruction statute, 18 U.S.C. 1513b2, a statute that has the following element. The defendant's conduct threatened, the defendant's conduct threatened to cause bodily injury to another person. And the court recognized that because the conduct at issue had to be implicitly communicative of a threat, Counterman applied. The same holds true here. Now, that case was on a sufficiency case. The court decided that despite Counterman, it would affirm. But it specifically noted that was not a case involving a faulty jury instruction, which is what we have here. Secondly, the government's men's rail argument. The fact that the statute has a knowing requirement does not mean that Counterman doesn't apply. In fact, that doesn't even distinguish Counterman itself. The Colorado statute at issue in Counterman had a knowing requirement. Also, the statute, the obstruction statute in Dotson had a knowing requirement. And there, as here, the government argued that that knowing requirement meant that Counterman did not apply. The court disagreed. 1513b requires Dotson knowingly commit the actus reus, sending the threatening message, rather than by accident or mistake. Additionally, unlike here, Dotson must possess the specific intent to retaliate against an informant. Nonetheless, the instructions on these elements did not address the additional element that Counterman requires. Counterman requires the government to show that Dotson was aware that others could view his message as threatening violence and at least recklessly sent them anyway. Here, the trial court committed instructional error under Counterman by not accepting the defendant's requested instruction that the defendants had to act with a subjective intent to make communications that they understood would be perceived as threats. And that error is not harmless. Because the error was preserved as the government conceives, an error instructing the jury is harmless only if it is clear beyond a reasonable doubt that a rational juror would have found the defendant guilty absent the instructional error. Here, there were three ways to violate the second element of the forced labor statute. The first being threats of serious harm to or physical restraint against that person or another person. The government explicitly argued in its closing argument that it did not have to prove all three. It only had to prove one. And the government argued throughout that it had proven the second element through that first method, explicitly relying on the instruction that violated Counterman. The government started its closing with a comment about a mom needing to make her husband happy, and the government said that set the tone for the next 14 years. It argued that verbal abuse was an implied threat to compel labor. The defendants called her a whore, a bitch. These words had a devastating effect on the victim. The defendants made her feel like she was failing her mother-in-law, made her feel like she was failing in her marriage. And to the victim, failing her marriage would have brought her dishonor. Again, they used verbal abuse to wear her down, to make her feel worthless. The government, in its closing, specifically repeated the judge's jury instruction that intent is objective. Why does this matter? This is a direct quote. It matters because, again, the definition of serious harm is judged by a reasonable person of the same background and same circumstances. In the government's response to the defendant's Rule 29 motion, they noted that Oman coerced services through implied threats of reputational harm. This court does not sit as an uber-jury to decide whether or not, as a factual matter, it would have convicted if it were the jury beyond a reasonable doubt. What it looks at is, is all the evidence on one side such that we know that the defendant was convicted by the permissible purpose, or is there evidence from which the jury could have convicted from the impermissible purpose? And here, there clearly was. Finally, with respect to whether or not this conduct falls within the ambit of the forced labor statute, this court has recognized that there are occasions where you have to look beyond the plain text of a statute, even if it is seemingly ambiguous, to understand, in context, whether there is an ambiguity. This is such a case. The trial court, as did the Sixth Circuit and Tovia, looked beyond the plain text of the statute for context. The statute was passed to create criminal and civil liability for engaging in practices outlawed by the 13th Amendment. It was not intended to provide remedies for conduct that fell outside the 13th Amendment, particularly areas that have been historically a matter of state concern. The government distinguishes Tovia by noting that it was applied in a situation where there was a purported parent-child relationship, and that's not the case here. Now, in Tovia, there was no actual parent-child relationship. The parents were not biological. It was the defendant's younger sister, two cousins of the defendant, unclear how closely they were related, and a nephew of the defendant's girlfriend. Nonetheless, the government here argues that somehow Tovia is confined to parental relationships. So are you suggesting that the fact that it was inside the house and that she was brought over to be married takes this labor outside the statute? Well, she was married before she was brought over, Your Honor, but yes, the fact that this is a Well, she wasn't brought over to marry somebody that she'd never met. She was forced to work inside the house. So is the dividing line a marriage and inside the house? Because that seems to be a problematic dividing line. Yes. So, Your Honor, this is a stronger case than Tovia because here it's not a de facto family relationship. It is a legal family relationship. And they were married. A familial relationship is something that has historically been a matter of state concern. There are any number of state statutes that go to domestic abuse. And, in fact, they were used in this case. There may be other federal statutes, such as the Violence Against Women Act, that apply to the conduct here. But what does not apply to the conduct here is the forced labor statute, which was specifically intended to give a liability for something that would be a violation of the 13th Amendment. At the time of the 13th Amendment, there simply were no laws, criminal laws, about domestic abuse, domestic violence. The 13th Amendment was not intended to and did not prescribe domestic abuse or domestic violence. Whether it should have may be a different question. But it did not. And so, therefore, it falls outside the invocative force. Well, I don't think that this is the abuse and the violence we're talking about. We're talking about forced labor. The same, Your Honor. Forcing labor within the home, within a family, was a matter of historical state concern, not something that was reached by the 13th Amendment and, therefore, not reached by the forced labor statute. And I see that my time is up, so unless there are additional questions, I'll cede to the government. Thank you, Mr. Pollard. Mr. Miller? Good morning, Your Honor. Stephen Miller on behalf of the United States. Your Honors, for 12 years, the defendants in this case, through a variety of means, physical, verbal abuse, through deprivation, starvation, isolation, through fear of deportation, fear of losing her children, obtained the labor of this victim. And they claim, Your Honor, that even though this activity goes to the heart of 1589, somehow they're immune from prosecution simply because a relative of theirs married the victim. And they claim, wrongly, that all that was involved was household work. As Mr. Pollack pointed out, we begin the analysis of this with a look at the language in the statute. And, as this Court said in Holland, if the language of the statute is clear and unambiguous, we stop. We don't have to go through the legislative analysis. So the language that they object to or they complain about is, whoever obtains the labor or services of a person. This language is unqualified. It doesn't say certain people. It says person. It doesn't say somebody who's not married or not a member of the family of the perpetrators. It says person. And so the analysis ends at that point. We know that it means a wide swath of people. In fact, as the 11th Circuit said in Well, you start with the textual. You said that's the beginning and the end. Then tell me where the limitation is. This would also apply, for example, to a person who, let's say, is married, and married in the United States, and she works a job just like her husband does, yet she has to come home and cook, take care of the children if they have children, clean the house, do all kinds of chores like that. Would this statute apply there? And the husband says, listen, you know, if you can't keep this house clean here, I'm going to divorce you and take these kids from you, and I'm going to get custody, sole custody. You're saying that just the plain text, that would be included. You could prosecute the Federal Court for that, right? Now, I want you to answer my question there. Don't ramble. Answer that question. Well, the answer to that is it depends, Your Honor. Depends? No, you said it's textual. When you start off, like, with arguing with me, and you said just looking at the text, that's the end of it. So since that's the end of it, why should you be equipoised about that? Domestic, she's working, it's untoward, it's threatening, and all those things. It's abusive. It's horrible. So what do you need to get you on the side of knowing what it is or not? When I say depends, it applies to persons, so it would apply to a spouse, and it depends on the nature of what was used to compel the abuse. I just told you, if you don't clean this house up and do these things, I'm going to take these kids, I'm going to get sole custody, and she stays there because she loves her children. That's why she works, not because she loves him or loves what's happening to her, but she loves her children. And she makes, similar to the facts here, I'm asking you, based on your textual interpretation, would that apply? It could apply, and again, it depends. Oh, my goodness, then, this statute is pretty broad. It gets away far from terms of, you know, the whole idea of labor is very important. That's the hook in terms of the interstate commerce aspect of it so the government doesn't overreach. That's the portal that you get to it because of labor. Now, you turn this into any situation where there's domestic, uneven power in the home. It has to be more than simply uneven power. And so if you look at... I just gave you my iPod. That's the same thing. And let's say he smacks her occasionally. So what Tovi Avi explained was the distinction in Tovi Avi, between Tovi Avi and cases where they said forced labor applies, is the nature of the deprivation, the nature of what was used to compel the labor. So in the scenario you say, it is not per se that a spouse is off limits. It depends on the nature of what is done in that particular case to compel it. I just told you what was done. So if there is physical abuse, if there's deprivation, if there's squalid conditions, as Tovi Avi talked about, that could be a forced labor case. The question is... So this statute really has no limitation in terms of any home, because it has no interstate commerce limitation. Any home, it doesn't have to be married, right? Correct. You don't have to have children, right? Correct. So what you have is a situation where you are doing household work, I assume without compensation, right? Because if they did the same thing and gave compensation, would there be a case? There are cases where people have received compensation, but they were still convicted of forced labor. So this really has no end. It doesn't have to be... Well, it has an end, because Congress wanted to end the situation where people are essentially in modern day slavery. And that can happen even with a spouse. That can happen... Congress wanted to end that? This is how they ended that? The purpose of 1589 was to allow for prosecutions of cases where you have forced labor. Under any circumstance that's, what, in a home? You don't have to be in a home, right? You do not have to be in a home. Right. They don't have to live in the same place, it applies. Correct? Is that correct? That is correct. There's no limitations. That's the whole point of it. There are limitations. The limitation is not who the victim is. Anybody can be a victim. What is the limitation? The limitation is the means that is used to obtain that labor. So, for instance, Tovey Avi explained that the distinction between Tovey Avi and the cases that did find forced labor were there were squalid conditions, there was physical abuse, there was deprivation, there was starvation. These are extreme circumstances, right? If we're simply talking about a husband who was not kind to his wife, no. Because those aren't extreme circumstances. What we had in this... Oh, I see. So the labor is not the extreme part. It's just what they do to get the labor. I thought the labor was the hook to this whole thing. It's to obtain labor, but it's the means they use to obtain the labor. But in this particular case, this was not simply household chores, right? This went well beyond simply household chores. So, for instance, the victim in this case had to clean, strip, and stain the porch by hand twice a year. She had to paint the inside and the outside of the house, remove the rugs, including the installed rugs. She had to remove them, take the nails out of them, take them outside, clean them, reinstall them. She had to take area carpets outside and clean them. She had to move heavy furniture, trim trees with an ax. She had to lay a cement walkway in the house. This goes well beyond simply household chores. Would this statute apply if the wife said, listen, I don't work. You married me because you love me, and you'll do anything. I'll leave you and take your kids if you don't do all these things that she did. Would it apply to a man? If he was scrubbing the floors, doing those things you just said, would it apply to him as the victim? If he is using threats? No, she. You missed my hypo. She is the person who is forcing him to do those things. Okay. So if she is using threats of serious harm or physical restraint, or if she is engaged in a scheme, a plan, or a pattern that's intended to cause this person to do that or an abuse of the law, then she could be prosecuted under it. Because the statute does not limit it to who the defendant is. I don't think it limits it to anything, based on the way you described it. It doesn't seem to be limited to very little. Because, you know, you decide, you're naming chores that people, those are things that people who are married don't do, strip floors and do those things like that. So, essentially, from the time she got up in the morning to the time she went to bed at night, she was a servant in that household, and she did things that nobody else in the household were doing that go well beyond what we would consider just normal household chores. She did do cleaning, but she did an awful lot more. She mowed the lawn in the summer. She laid a cement walkway. She trimmed the trees. She took... Well, it's not just the chores. It's the forced nature of the chores. That is correct. And the abuse. That is correct. So if I go home and I tell my wife, you need to mow the lawn, that's not forced labor. If, on the other hand, I refuse to allow her to eat, and I physically abuse her, and I do other things that are draconian to compel her against her will to provide her labor and services, then the statute applies. So it is not without limitation. Are cultural differences considered in that what, in fact, is threats? Cultural differences in terms of the way people look at marriage and their responsibility. In other words, I mean, you put this on the temporal because you talked about things that are done. Is that things that are done because of the normal American family? But, again, it gets back to what you do to compel it. So it doesn't matter that there may be a culture to beat your spouse. That is still not permitted in the United States. It may be the culture to deprive your spouse of food. Exactly. That's why you have criminal statutes in states. That's the difference. It's like the fallacy or false dilemma of what you're doing. You say, oh, if we don't do this, there's nothing to protect. Yes, there is. It's called state laws. And you can go to prison for a long time for it. The question is, is it a proper reach by the federal government through the statute to do so and criminally prosecute? We're not talking about whether or not this is wrong. It's horrible. But there's a reason to do that. And that's why limited government. We have a federalism government in the sense that these are things that are normally left to the states in terms of criminal prosecution. Everything you said, right, would be criminal, wouldn't it? You're threatening to beat your wife, your spouse. You're doing those things like that. That's a crime. But that is true with respect to every forced labor case. You could prosecute virtually every forced labor case under a state statute. Not really. No. That's true. Go ahead. I'm sort of following up on Judge Gregory's question. What is the federal component here? What provides for federal jurisdiction for this crime? The way that the domestic violence statute has an interstate commerce nexus in some way. Sure. So here, what is it? So it begins with the 13th Amendment, which prohibits slavery. And Congress's intent was to make as broad as possible the ability of the federal government to prosecute people who are forced against their will under draconian circumstances to provide labor. But getting to Judge Gregory's point, the same circuit that decided Calihan, excuse me, decided Tove Ali Calihan 13 months later, in that particular case, the same argument was made. It said, Your Honor, the government could have prosecuted this in state court. And what Calihan said was it doesn't matter because the conduct in this case goes to the heart of 1589. And so, therefore, the court said, quote, that it matters little that defendants' conduct may have also violated various state laws. There is a federal interest in ensuring that people are not compelled against their will to provide labor or services. And that's the federal interest. And the federal government has a strong interest in prosecuting those particular cases. Virtually every forced labor case that I've read involved incidents, activity that could have been prosecuted under state law. There's physical violence. There is fraud. There are all kinds of things that are used to compel the labor. But the point is that the interest is to prevent people from being compelled against their will under draconian circumstances, which is what you had in this case, to provide their labor. And that's why the statute applies in this particular case. Tove Ali doesn't change any of that. Tove Ali was a narrow opinion on a narrow set of facts. Essentially, what the court said there was, we have a person in loco parentis, basically a parent, who under the law of Michigan has a right to the services of the child. And they went through a whole series of laws that provided that. For instance, the child labor laws did not apply to parents. Under Michigan law, a parent has a right to the work of the child. And so what the court there said was the statute cannot possibly apply to somebody obtaining the labor that they're entitled to have from that particular person. And gave the example, if that were the case, then a parent who had a recalcitrant trial, who didn't want to do chores, and the parent spanked the child to get the chores, that could be forced labor. That cannot be what Congress was going after. Why not? Under the statute, why not? Because the parent has a right to that labor. In this particular case, the defendants had no right to the labor of someone who was married to one of their relatives. And so that's why there's a distinction. That's why the forced labor statute applies in this particular case. Tell me about the jury instruction. I mean, the jury strike. That's an issue. Okay. So the judge said you're playing with fire. What do you think the judge meant by that? Well, I can't tell you specifically what was on his mind. But what I can tell you is immediately after he denied their motion. So the defendants have not told you the entire story of how the strikes occurred. And I think that that's relative in this case. So there were two panels that we struck from or that we picked from. The first panel, we struck two African Americans who were young, who were single and without children. And then we struck two white females who were in their 70s. Notably, we did not strike from that panel an African American female who was 42, who was married and had three children.  So she did not. You want to strike a single person? Wouldn't it be a married man that you'd want to strike first? There are a whole lot of things that we would be interested in. But a married man, I. Yeah, a married man would be otherwise in terms of, I mean, I used to practice law. I did a lot of jury trials. Well, if anybody who's afraid that this might be used against them, wouldn't it be a married man, not a single man? Yeah, I would. I mean, just common sense now. We're not talking about law. You don't have to look into the book on this one. I mean, wouldn't it be a man who said, wait a minute, I'm married here. I asked my wife to do too many things. I might get. It doesn't make sense that you would. Your Honor, I would hope that any married man would understand what happened in this case. Now, you go into the theory now. We're talking about the practical thing in terms of picking a jury. No, we're talking about picking a jury. We're not talking about, oh, this, well, I would hope that theoretically everybody would be kumbaya. But that's not the case. You're trying to pick a jury. And tell me why wouldn't you want, in terms of you had a man is married, a man is single. In this case, why wouldn't it be intuitively better to have someone that's a single man than a married man? Again. Answer that question, Mr. Miller. The reason is that in this particular case, we believe that it was important for people to understand how a correct marriage works and to understand the relationship between spouses. So you were doing missionary work rather than trying this case. We weren't doing missionary work. We were simply trying to. You thought it was important for people to understand what a real marriage was like. It isn't. No, I see. So that's the space where you took black people off. I'm sorry? That's why you took black people off, because they wouldn't know. We took off. I wonder why you took the black people off. Everybody who fell into the category of young, under 30, single, and without children. It seemed like a lot of people who were black, too. They were white, also. Yeah, but you got a narrow, you took a lot of black people off percentage wise, didn't you? We took off three African Americans, that's correct. Right. Did you leave any on? I'm sorry? Did you leave any on? We did. In fact, in the first round, when we struck two African Americans and two white individuals, we did not leave off a juror who was 42, married, and with three children, because she did not fall into that category. We then, in. . . The actual jury that heard to the verdict, there were no blacks, right? Because one person didn't show up with something. So there was an African American we did not strike, another African American. There were four African Americans we had the opportunity to strike we did not. One of them ended up on the jury initially, and then she had child care issues and she had job issues, and so she was removed. So the other three were alternates? There were two that were alternates. We did not strike them either. So the bottom line is everyone who fell into the category that we explained to the court, that is young, single, and no children, was struck, whether they were black or they were white. There was no African American who did not fall into that category that we did strike. What's the standard of review on the Batson challenge? So basically, the standard of review is that you give the court great deference and that you sustain it unless it is clearly erroneous. Because this is a factual issue, right? Was the government racially motivated in this particular case? And the district court has the best opportunity to judge that. We looked at everything that happened, and contrary to what Mr. Pollack said, the court actually said, I may not have done it that way myself, but that does not mean it was improper. The court specifically found, after listening to the explanation, looking at what happened, that there was not an issue or a problem here. And so this court gives that determination great deference. So you're saying that the statement, you may be playing with fire, had nothing to do with race? I cannot tell you what he meant. What I know is, you want to see my time is up. Go ahead. I can't tell you what was in his mind at that particular moment in time. All I know is that immediately after that, he denied the motion. And on three separate occasions, he said that there is nothing wrong with what the government did. And there is no basis in the facts to determine that that is. What were the three separate occasions that the district court said there was nothing wrong with what the government did? So initially, the defendants raised a Batson challenge, and the judge denies it. And that's when he said, I may not have done it the way. No, that was later. All right. And then when we struck a 34-year-old white individual who was single with no children, the issue came up again. And our explanation, at that point in time, we only had one strike left. So all the other things didn't matter, right? Because you always have to worry about somebody who is behind you who hasn't been picked yet who is going to be far worse off. And so that's when he said, you're playing with fire, but he denied it. Then the defendants raised it again at the end of the case because we needed to replace the juror who was removed. And so the next person up was a white individual. And the defendants renewed their Batson challenge and said, Judge, we want you to place one of the two African-Americans that the United States did not strike on the jury. And the defendant, at that point in time, that's when he said, I might not have done it that way, but there's nothing wrong with what the government did. So at the end of the day, the facts support the race-neutral explanations that the court gave, that the United States gave, and there is no basis to find that the court clearly erred. What about countermen in terms of this? You didn't have a specific jury verdict, right? They didn't come back. They did not. Therefore, so that they could have done so based on your argument you made in verbal threats. Well. They could have, correct? You argued it, right? Well, that was a part of a scheme or plan. Right. Verbal threats would have been enough to be convicted. But under a scheme and plan, as a statute and the instructions say, that we have to show specific intent, that they intended to do that. So the defendants talk about. They didn't intend to do something. Countermen talk about you can have knowledge that you're doing. That's not the question. The question is, do you have subjective intent to make this happen? And they tried to get that instruction, and they were not allowed to have that. So we don't know whether maybe that was enough. The fact that they had verbal threats. What Mr. Pollack left out. He said there are two arguments where countermen doesn't apply for two reasons. The most compelling argument is the judge, in fact, did instruct the jury correctly. I would like to explain. On verbal threats? The judge explained that there has to be knowledge with respect to each one of the other elements. Knowledge is not enough to comply with countermen. To know that you're saying this to them, that's not the question. The question is to have a belief that at least recklessnessly, avoiding a substantial risk that it might be determined to be a threat in terms of harm to them. Yeah, you know that. In other words, the knowledge is. So countermen have the lowest possible mens rea, which is reckless. 1589 carries a higher mens rea, which is knowledge. And the court instructed the jury that they had to find each of the other two elements with knowledge. Knowledge of what? Knowledge of what? So the instruction that the court gave on knowledge was that knowing describes the alleged state of mind of the defendant. Consciousness of his or her actions realized what he or she was doing or what was happening around him or her and did not act because of ignorance, mistake, or accident. And then indicated you may infer knowledge from the natural and probable consequences of acts knowingly done or knowingly admitted. So the court told the jury, you have to find that the defendants knew. Knew what? First, that they obtained the labor. And secondly, that what they were doing was. That's not in that instruction. No, just to know. Well, you knew that you were doing what you did. That doesn't mean there's not enough account in the sense that it talks about a subjective intent. And that's why that instruction is important. Because they need to know that not what the reasonable person would have, the victim, if you would, would have viewed this as a threat. Is that you had subjective knowledge that it was a threat. That would lead to someone feeling threatened physically about their safety. So anyway, I see your argument. That's what I thought it was. I just want to see that you have another argument beyond your brief. The problem with the defendant's jury instruction, the one they proffered, was wrong because they tried to import into the definition of threat the mens rea. And counterman itself says that that's not correct. That you look at the definition of threat through the eyes of the victim. So first of all, you have to find there's a threat. And you look at that through the eyes of the victim. And then you find out whether it's actionable. That is, whether there's the proper mens rea. And the court said, here is the definition of intent. And it correctly said that you look at it based on what a reasonable person would understand a threat to be. That's a correct statement of the law. The defendant's statement of the law there is incorrect by importing the intent, the mens rea, there. The court gave a separate instruction on mens rea. Once you find intent, then you have to find mens rea. So in this particular case, the instructions were correct. And this court should affirm. Thank you. Thank you, Mr. Miller. Mr. Pollack, you have a little time reserved. If I can, I'm going to, again, reverse the order. I'm going to start with Batson rather than address the arguments in the order the counsel to the government did. With respect to Batson, I point the court to United States v. Alvarado, which is a Second Circuit case, that says a prosecutor may not avoid the Batson obligation to provide race-neutral explanations for what appears to be a statistically significant pattern of racial peremptory challenges simply by forgoing the opportunity to use all of his challenges against minorities. The government points to the fact that it didn't use all of its challenges against blacks, and that is true. However, most of those were challenges that came up after the court questioned the government about juror number 42. So they say nothing about whether or not the government's reasons for striking 42 were pretextual. And, of course, striking even a single jury based on race is impermissible. With respect to Canterman, the government talks about, with respect to whether it was harmless, the fact that there has to be a scheme or plan. The government is conflating the different ways the jury was instructed that the forced labor statute can be violated. The jury was told it could be violated in three different ways. And the government explicitly argued we only have to prove one of them. The first of those is by threats of serious harm. The second of those is by means of a scheme or plan. So the first one does not require a scheme or plan. It only requires threats. And the government specifically argued that's all we have to prove, and then specifically argued that they had proved threats, both verbal threats and implied threats through physical abuse. With respect to the subjective intent instruction that the defense asked for, it was straight out of the model instruction. It was straight out of sand. The judge just simply excised it. The government's sole argument here is, well, it really shouldn't have been in that place in the instructions. It should have been somewhere else in the instructions. But the fact of the matter is the defense asked for that instruction. It was not given anywhere. And so the jury was left with the government's argument that all the government needed to show was that the defendants knew they were making statements, whether express verbal statements or implied statements through conduct, and that the victim in fact perceived those as a threat. What the jury was never told was that they had to find the defendants intended them to be a threat and intended them to be perceived that way or understood that they would be perceived that way. That omission is reversible error. And then lastly, with respect to the conduct, the government says, well, all we've got to do is look at the plain text full stop. But then in response to Judge Gregory, your questions, the government told us, well, it has to be extreme circumstances. The labor itself has to be extreme. Cleaning the carpet might be okay, but pulling the nails out of the carpet may not. But, of course, none of that is in the text of the statute. It undermines the very premise that you just look at the text and you stop. I think what the government said was not that it's not the nature of the labor itself, but the forced component of the labor. That's what I understood the government's argument to be. I understood the government to argue each. But regardless, either way, there is nothing by, if all we're going to do is look at the terms of the statute, ignore context, ignore legislative history, then that limiting principle that the government added, that there have to be extreme circumstances that compel the labor, simply isn't in the text. The text is, as Judge Gregory says, completely unbounded. And as Judge Gibney recognized, there are cases where you do look beyond this seemingly ambiguous text. Did the victim here perform this labor of her own accord, or was she forced? Your Honor, I think that there is certainly evidence from which the jury could have found that it was forced. But that is different from whether or not we can say beyond a reasonable doubt that the jury would have convicted had they known that it didn't matter whether the defendants intended that their actions would compel the labor. Your Honor, with that, I see that my time is up. If there are no further questions, I'll conclude. But obviously, if there are, happy to answer them. Thank you. Thank you, Mr. Pollack, and Mr. Will as well. We'll come down to Greek Council and proceed to our next case.
judges: Roger L. Gregory, Stephanie D. Thacker, Nicole G. Berner